**ORDERED.**

Dated: September 30, 2025

Grace E. Robson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re<br><br>Joseph Robert Minnix,<br><br>    Debtor.<br>_____<br><br>C&S Building & Renovations, Inc.,<br>Craftwork Carpentry and Millwork, Inc.,<br>and Jeffrey Struck,<br><br>    Plaintiffs,<br><br>v.<br><br>Joseph Robert Minnix,<br><br>    Defendant.<br>_____ | Case No. 6:23-bk-03343-GER<br>Chapter 7<br><br><br><br><br><br>Adv. No. 6:23-ap-00129-GER |

**MEMORANDUM OPINION**

THIS PROCEEDING came before the Court for trial on May 27-28, 2025 (the "Trial") on the Complaint[1] filed by Plaintiffs C&S Building & Renovations, Inc. ("C&S"), Craftwork Carpentry and Millwork, Inc. ("CC&M"), and Jeffrey Struck ("Mr. Struck") (collectively,

---

[1] *Complaint Objecting to Dischargeability of Debt, to Liquidate Non-Dischargeable Obligation, and for Equitable Lien* (the "Complaint") (Doc. No. 1). Unless otherwise noted, all "Doc. No." citations refer to pleadings filed in this proceeding.

"Plaintiffs"), as well as the Objection to Exemptions[2] filed by Plaintiffs and the Response[3] thereto filed by Debtor/Defendant Joseph Robert Minnix ("Mr. Minnix").[4] In the Complaint, Plaintiffs request the Court determine that Mr. Minnix's debt to Plaintiffs is not dischargeable pursuant to § 523(a)(2)(B) and (a)(6) of the Bankruptcy Code (Counts I and II, respectively),[5] liquidate the non-dischargeable obligation (Count III), and impose an equitable lien on Mr. Minnix's Homestead[6] (Count IV).[7] The Court, having considered the testimony and demeanor of witnesses and documentary evidence, the record and the parties' arguments, **FINDS, ORDERS AND ADJUDGES as follows:**

## BACKGROUND

A.  Mr. Minnix, a commercial carpenter, formed Craftwork, Inc. ("Craftwork"), a millwork, carpentry and cabinetry company, in 1988.[8] While he was not always the sole owner, Mr. Minnix had been the 100% owner of Craftwork since 2012.[9]

B.  Mr. Minnix started having financial troubles in 2007.[10]

C.  Starting in 2018, Mr. Minnix began taking out merchant cash advance ("MCA") loans to keep the business going.[11]

---

[2] *Objection to Exemptions of C&S Building and Renovations, Inc., Craftwork Carpentry and Millwork, Inc. and Jeffrey Struck* (the "Objection to Exemptions") (Main Case, No. 6:23-bk-03343-GER, Doc. No. 10). Hereinafter, "Main Case" refers to Case No. 6:23-bk-03343-GER.
[3] *Debtor's Response to Objection to Exemptions of C&S Building and Renovations, Inc., Craftwork Carpentry and Millwork, Inc. and Jeffrey Struck* (the "Response") (Main Case, Doc. No. 13).
[4] The Objection to Exemptions and Response were consolidated with this proceeding per the *Order (1) Consolidating Objection to Exemptions with Adversary Proceeding 6:23-ap-00129-GER and (2) Scheduling Pretrial Conference in Adversary Proceeding* (Main Case, Doc. No. 30).
[5] Hereinafter, unless otherwise specified, all section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.
[6] The "Homestead" refers to real property located at 1138 Shadowbrook Trail, Winter Springs, FL 32708.
[7] The Objection to Exemptions was on the same basis as the request to impose an equitable lien, objecting to Mr. Minnix's homestead exemption to the extent Mr. Minnix satisfied the mortgage on his Homestead with funds obtained from Plaintiffs through fraud or egregious conduct.
[8] Trial Tr. vol. 1 at 27:22-28:1, 29:10-17. "Trial Tr. vol. 1" citations refer to the May 27, 2025 trial transcript (Doc. No. 79), and "Trial Tr. vol. 2" citations refer to the May 28, 2025 trial transcript (Doc. No. 80).
[9] Trial Tr. vol. 1 at 28:9-29:9.
[10] Trial Tr. vol. 1 at 32:6-14.
[11] Trial. Tr. vol. 1 at 45:17-47:10.

D.   In 2019, Mr. Minnix decided to sell Craftwork, and it was placed on the market along with the commercial real estate (the "Commercial Property") from which Craftwork operated.[12] In connection with the sale, a *Confidential Business Review* (the "Business Offering") was prepared by Crowne Atlantic, a business broker, listing Craftwork for sale for $1.99 million and indicating that a sale of the Commercial Property would have to be negotiated separately.[13]

E.   The Business Offering contained financial information regarding Craftwork, including "Interest Expense" and "Owner Benefit" reflected as follows[14]:

| Year | Interest Expense | Owner Benefit |
| --- | --- | --- |
| 2017 | $4,902 | $409,683 |
| 2018 | $206,067 | $511,430 |
| 2019 | $538,261 | $869,628 |

F.   Mr. Struck, who has worked in many trades including construction and real estate, started C&S, a construction company, in 2001.[15]

G.   Mr. Struck became aware of Craftwork after receiving the Business Offering via email.[16] He was interested in Craftwork because it was close to where he was living and the "owner benefit."[17]

---

[12] Trial Tr. vol 1. at 39:19-24, 41:8-43:10. The Court notes that Trial Tr. vol 1 at 42:22 reflects the street address for the Commercial Property as 277 S. Financial Court; however, the correct address is 2777 S. Financial Court, Sanford, FL 32773. *See* Pls.' Ex. 115 (Doc. No. 60-16).
[13] Pls.' Ex. 115 (Doc. No. 60-16).
[14] Pls.' Ex. 115 (Doc. No. 60-16).
[15] Trial Tr. vol. 1 at 166:1-167-6.
[16] Trial Tr. vol. 1 at 171:22-172:6.
[17] Trial Tr. vol. 1 at 172:7-173:9.

H. In July 2020, C&S and Craftwork executed a *Contract for Sale and Purchase* (the "Property Contract")[18] regarding the Commercial Property for the purchase price of $1,600,000. The Property Contract was contingent on C&S obtaining financing.

I. In July 2020, CC&M[19] entered into the *Asset Purchase Contract and Receipt* (the "Asset Contract")[20] to purchase Craftwork's "business assets at the total Purchase Price" of $2,000,000, which was also contingent on financing.

J. The financing obtained by C&S and CC&M to acquire the Commercial Property and Craftwork's business assets consisted of loans from Newtek Small Business Finance, LLC ("Newtek") and issuance of two promissory notes in favor of Mr. Minnix, which were never paid.[21]

K. The Asset Contract provided that: "Buyer hereby acknowledges that Buyer is relying solely on Buyer's own inspection of the Business and the representations of Seller regarding the prior Business operating history, the value of the assets being purchased and all other material facts."[22]

L. Prior to closing on the Property Contract and the Asset Contract, Mr. Struck hired Dr. Tom Lawless ("Dr. Lawless") to analyze Craftwork's business,[23] and Dr. Lawless started working remotely and in person at Craftwork to assist Mr. Struck in the closing.[24] Post-closing, Dr. Lawless became the CEO of CC&M.[25]

M. Both Mr. Minnix and Dr. Lawless provided numbers that went into the profit and loss statement for Craftwork for the period of January through December 2020 (the "2020

---

[18] Pls.' Ex. 84 (Doc. No. 59-34).
[19] "C&S Building and Renovations, Inc. and or assigns" was the entity listed as the buyer. At trial, Mr. Struck testified that the business was ultimately put in the name of CC&M. Trial Tr. vol. 1 at 168:16-19. Assignment was permitted under the Asset Contract. *See* Asset Contract ¶ 9.1.
[20] Pls.' Ex. 83 (Doc. No. 59-33).
[21] Pls.' Ex. 94 (Doc No. 59-44); Pls.' Ex. 95 (Doc. No. 59-45); Trial Tr. vol. 1 at 69:6-22.
[22] Asset Contract ¶ 57.
[23] Trial Tr. vol. 1 at 177:23-178:2; Trial Tr. vol. 2 at 164:13-15.
[24] Trial Tr. vol. 2 at 165:22-166:21; *see also* Trial Tr. vol. 2 at 121:18-24, 127:1-2, 130:25-131:3.
[25] *See, e.g.*, Trial Tr. vol. 2 at 213:3-5.

P&L"),[26] which was prepared by Melinda Engle ("Ms. Engle"), the outside bookkeeper for Craftwork during the relevant period of time.[27] The 2020 P&L shows sales totaling $6,344,753.36, interest paid totaling $813,240.32 and a net income of *negative* $812,565.73.

N. On February 2, 2021, after signing the contracts, but before closing, Mr. Minnix sent Dr. Lawless a copy of the 2020 P&L.[28] Dr. Lawless then forwarded the 2020 P&L to Mr. Struck.[29]

O. After almost a year of Plaintiffs seeking a lender, Newtek approved financing in the amount of $1.8 million,[30] and on June 30, 2021, closing occurred and C&S acquired the Commercial Property and CC&M acquired Craftwork's business assets.[31]

P. As part of the closing, the mortgages on the Commercial Property and Mr. Minnix's Homestead were paid off.[32]

Q. The Asset Contract was contingent upon Mr. Minnix entering into an employment agreement with CC&M "to last for a period of no less than five (5) years,"[33] and Mr. Minnix worked for CC&M[34] until sometime in September 2022.[35]

R. In May 2024, Newtek sued Plaintiffs (among others)[36] for default on the note.

---

[26] Pls.' Ex. 42 (Doc. No. 58-42); Trial Tr. vol. 2 at 120:22-121:17.
[27] Trial Tr. vol. 1 at 31:25-32:2; Trial Tr. vol. 2 at 121:18-24.
[28] Pls.' Ex. 42 (Doc. No. 58-42).
[29] Pls.' Ex. 42 (Doc. No. 58-42).
[30] Pls.' Ex. 12 (Doc. No. 58-12); Trial Tr. vol. 1 at 182:22-183:11; 209:8-211:16.
[31] Pls.' Ex. 122 (Doc. No. 60-23).
[32] Pls.' Ex. 14 (Doc. No. 58-14); Trial Tr. vol. 1 at 21:11-25, 182:19-21; Pls.' Ex. 122 (Doc. No. 60-23).
[33] Asset Contract ¶ 63.
[34] Trial Tr. vol. 1 at 141:25-142:2.
[35] Trial Tr. vol. 1 at 148:7-10. While Mr. Minnix testified that he resigned, Dr. Lawless testified that Mr. Minnix was terminated. *See* Trial Tr. vol. 2 at 183:13-184:4; *see also Closing Argument of C&S Building & Renovations, Inc., Craftwork Carpentry & Millwork, Inc., and Jeffrey Struck* at 17 ("Plaintiffs' Closing Argument") (Doc. No. 84).
[36] Pls.' Ex. 12 (Doc. No. 58-12); Trial Tr. vol. 1 at 209:8-211:16.

S.  On August 17, 2023, Mr. Minnix filed a voluntary petition under Chapter 7 of the Bankruptcy Code.[37]

T.  Plaintiffs timely filed the Objection to Exemptions in the Main Case, to which Mr. Minnix responded.

U.  Plaintiffs thereafter filed the Complaint, which includes a request to impose an equitable lien on Mr. Minnix's Homestead.

V.  The Court consolidated the Objection to Exemptions with this proceeding.[38]

W.  On July 14, 2025, the parties filed written closing arguments.[39]

## JURISDICTION AND VENUE

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b) and the Middle District of Florida's standing Order of Reference.[40] This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (I). This adversary proceeding is related to Mr. Minnix's Chapter 7 bankruptcy case, which is pending before this Court. Venue is proper pursuant to 28 U.S.C. § 1409.

## DISCUSSION

"Section 727 of the Bankruptcy Code provides that a debtor in a chapter 7 case shall receive a discharge from all of his debts which arose before the date of the order for relief, unless one of the specified conditions set forth in that section is present."[41] Section 523 contains exceptions to the discharge, and § 523(a) "sets forth several categories of debts which are excepted from the

---

[37] Main Case, Doc. No. 1. A court may take judicial notice on its own or upon a party's request at any stage of a proceeding of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201. The Court therefore takes judicial notice of the pleadings and orders in the Main Case.
[38] *See supra* note 4.
[39] Plaintiffs' Closing Argument; *Defendant's Closing Argument* ("Mr. Minnix's Closing Argument") (Doc. No. 85).
[40] *Order of Reference of Cases Arising Under Title 11, United States Code, and Designating Bankruptcy Judges to Conduct Jury Trials and Act as Settlement Judges*, *In re Administrative Orders of the Chief Judge*, No. 3:21-mc-1-TJC (M.D. Fla. Oct. 29, 2024) (the "Order of Reference").
[41] *In re Thompson*, 207 B.R. 7, 9 (Bankr. M.D. Fla. 1996).

6

discharge."[42] A plaintiff must prove non-dischargeability under § 523(a) by a preponderance of the evidence.[43] Courts liberally construe the statutory exceptions to discharge in favor of a debtor and narrowly against a creditor in order to ensure that the "'honest but unfortunate debtor' is afforded a fresh start."[44]

Plaintiffs seek a determination of the dischargeability of a debt[45] under § 523(a)(2)(B) and (a)(6), which provide, in relevant part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> . . .
> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

---

[42] *Id.*

[43] *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661, 112 L. Ed. 2d 755 (1991).

[44] *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994) (first quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987); then citing *Boyle v. Abilene Lumber, Inc. (In re Boyle)*, 819 F.2d 583, 588 (5th Cir. 1987); then quoting *Birmingham Tr. Nat'l Bank v. Case*, 755 F.2d 1474, 1477 (11th Cir. 1985); and then citing *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987)); *see also, e.g.*, *Jennings v. Maxfield (In re Jennings)*, 533 F.3d 1333, 1338-39 (11th Cir. 2008) ("The Bankruptcy Code favors discharge of an honest debtor's obligations. The general policy that provisions denying such a discharge are construed liberally in favor of the debtor and strictly against the creditor applies only to the honest debtor." (citation omitted) (citing *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir. 1993))).

[45] The debt at issue here has not been liquidated and Plaintiffs are seeking liquidation. The Court has jurisdiction to liquidate damages. *See, e.g.*, *BMO Harris Bank, N.A. v. Richert (In re Richert)*, 632 B.R. 877, 892 (Bankr. M.D. Fla. 2021) (first citing *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011); and then citing *Old Republic Nat'l Title Ins. Co. v. Vermilio (In re Vermilio)*, 457 B.R. 854, 862 (Bankr. M.D. Fla. 2011)). Additionally, determining whether a debt is non-dischargeable is a two-step process; the court typically must first determine whether a claim exists under state or non-bankruptcy federal law and then determine whether the debt is non-dischargeable. *See, e.g.*, *Hurston v. Anzo (In re Anzo)*, 547 B.R. 454, 464 (Bankr. N.D. Ga. 2016) (first citing *Est. of Smith v. Smith (In re Smith)*, 495 B.R. 291, 297 (Bankr. N.D. Miss. 2013); and then citing *Gill Distrib. Ctrs., Inc. v. Banks (In re Banks)*, 225 B.R. 738, 744 (Bankr. C.D. Cal. 1998)). However, in this proceeding, the Court finds it appropriate to examine the dischargeability issue first because if the debt (whatever it may be) is found to be dischargeable, the existence of the debt and the amount is irrelevant, as Mr. Minnix has received a discharge in the Main Case and the Main Case is a no-asset case and therefore no distributions would be made to creditors. *See, e.g.*, *Feldy Boys, LLC v. Polasky (In re Polasky)*, Ch. 7 Case No. 2:18-bk-05576-FMD, Adv. No. 2:18-ap-594-FMD, 2021 WL 614032 (Bankr. M.D. Fla. Feb. 17, 2021) (examining the dischargeability of the debt without discussing whether the debt existed under state or other non-bankruptcy federal law); *see also Keasler v. Smith (In re Smith)*, Ch. 7 Case No. 24-10822, Adv. No. 24-5016, 2025 WL 1671990, at *7 n.42 (Bankr. D. Kan. June 11, 2025) (recognizing the two-step process and finding it appropriate to address the two-steps in reverse order); *Associated Mortg. Corp. v. Weaver (In re Weaver)*, 579 B.R. 865, 903-05 (Bankr. D. Colo. 2018) (recognizing the two-step process and addressing whether the claim existed under state law after addressing dischargeability).

7

    (iv) that the debtor caused to be made or published with intent to deceive;
or
    . . .
    (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

**A. Non-Dischargeability Under § 523(a)(2)(B) – Count I**

"Section 523(a)(2)(B) applies to a debtor's written statements that present a substantially untruthful picture of the debtor's financial condition by misrepresenting the type of information that would normally affect the decision to grant credit."[46] To except a claim from discharge under § 523(a)(2)(B), a plaintiff must prove: (1) the debtor is liable for a debt obtained through the use of a written statement; (2) the written statement was materially false; (3) the written statement concerns the debtor's or an insider's financial condition; (4) the plaintiff reasonably relied on the statement; and (5) the debtor published the writing with the intent to deceive the plaintiff.[47] Each element must be proven by a preponderance of the evidence,[48] otherwise the debt is dischargeable.[49]

The first element is satisfied as the written statement at issue in this proceeding is the 2020 P&L[50] and the parties did not dispute that it qualifies as a written statement[51] used by Mr. Minnix.[52]

---

[46] *In re Polasky*, 2021 WL 614032, at *5 (citing *Itria Ventures LLC v. Chadha (In re Chadha)*, 598 B.R. 710, 718 (Bankr. E.D.N.Y. 2019)).

[47] *See, e.g.*, *In re Anzo*, 547 B.R. at 465 (citing *Bank of N. Ga. v. McDowell (In re McDowell)*, 497 B.R. 363, 369 (Bankr. N.D. Ga. 2013)); *see also In re Polasky*, 2021 WL 614032, at *6-9.

[48] *See Grogan*, 498 U.S. at 291, 111 S. Ct. at 661.

[49] *See In re Anzo*, 547 B.R. at 465 (citing *In re Miller*, 39 F.3d at 304).

[50] The 2020 P&L was the exhibit brought up at Trial and identified in Plaintiffs' Closing Statement to be the written statement at issue. Trial Tr. vol. 1 at 115:8-20 ("[The 2020 P&L] is the main financial statement Mr. Struck says is materially false."); Plaintiffs' Closing Argument at 2 ("Claimants rely upon Plaintiffs' Exhibit [ ] #42, which is a 2020 profit and loss statement for Craftwork, Inc.").

[51] "As long as the written statement is written, signed, adopted or used by the debtor, the basic precondition concerning the writing requirement to the non-dischargeability complaint under section 523(a)(2)(B) is met." *In re Anzo*, 547 B.R. at 465 (quoting *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001)). "It need not be signed by the debtor, but the debtor must affirm the writing in some respect by using it or adopting it." *Id.* (citing *1st Farm Credit Servs., PCA v. Phillips (In re Phillips)*, Ch. 12 Case No. 05-87521, Adv. No. 06-8069, 2007 WL 1297011, at *4 (Bankr. C.D. Ill. May 1, 2007)).

[52] Mr. Minnix did not draft the 2020 P&L; however, he reviewed it and sent it to Dr. Lawless who forwarded it to Mr. Struck. Pls.' Ex. 42 (Doc. No. 58-42); Trial Tr. vol. 1 at 81:15-82:3, 115:5-20, 185:9-21.

The Court finds the third element is also satisfied as the 2020 P&L concerned the financial condition of Craftwork, an insider.[53] For the reasons discussed below, the Court finds that Plaintiffs failed to prove the 2020 P&L was materially false (the second element) or that they reasonably relied on the 2020 P&L (the fourth element); therefore, the Court need not address the issue of intent (the fifth element).

### 1. Materially False

To prove the materially false element, the plaintiff must demonstrate that the statement "paints a substantially untruthful picture"[54] of the debtor's or insider's financial conditions by misrepresenting information of the type that would normally affect the decision at issue.[55] A plaintiff must do more than demonstrate that a written statement is "merely erroneous or untrue."[56] Rather, a plaintiff must demonstrate the written statement contains "a significant understatement of liabilities and exaggeration of assets."[57]

Plaintiffs state the 2020 P&L was "the financial statement that [Mr. Struck] primarily relied upon to acquire Craftwork."[58] Mr. Struck testified that he mainly relied upon the "interest number

---

[53] "Financial condition" is not defined by the Bankruptcy Code, and "[c]ourts are split on whether the term should be defined narrowly to refer only to the debtor's overall financial condition such as net worth or solvency, or be defined more broadly to include representations regarding ownership of or encumbrances on an asset." *In re Anzo*, 547 B.R. at 466-67 (citing *Schneiderman v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 112 (2d Cir. 2002)). Regardless of how the Court defines "financial condition," there does not appear to be any dispute that the 2020 P&L concerned the financial condition of Craftwork, which was owned 100% by Mr. Minnix at the relevant time, and is therefore an insider of Mr. Minnix. *See* 11 U.S.C. § 101(31)(A)(iv) (defining "insider" to include a "corporation of which the debtor is a director, officer, or person in control").
[54] *In re Anzo*, 547 B.R. at 466 (quoting *Delta Cmty. Credit Union v. Greene (In re Greene)*, Ch. 7 Case No. 13-65956-MGD, Adv. No. 13-05326, 2013 WL 6911376, at *2 (Bankr. N.D. Ga. Dec. 24, 2013)).
[55] *In re Polasky*, 2021 WL 614032, at *6 (citing *In re Anzo*, 547 B.R. at 465-66).
[56] *In re Anzo*, 547 B.R. at 466 (quoting *Hudson Valley Water Res. v. Boice (In re Boice)*, 149 B.R. 40, 45 (Bankr. S.D.N.Y. 1992)); *accord In re Polasky*, 2021 WL 614032, at *6 ("To prove that a written financial statement is materially false it is not enough to show that the statement is untrue").
[57] *Master Fin., Inc. v. DeJulio (In re DeJulio)*, 322 B.R. 456, 461 (Bankr. M.D. Fla. 2005) (citing *O'Donnell v. Floyd (In re Floyd)*, 177 B.R. 985, 990 (Bankr. M.D. Fla. 1995)), *judgment entered* (Jan. 11, 2005).
[58] Trial Tr. vol. 1 at 185:9-24; *accord* Plaintiffs' Closing Argument at 7 ("Struck made the decision to move forward with the closing, with [the 2020 P&L] being the primary document he relied upon, and specifically its revenue and MCA interest expense numbers.").

9

and the revenue number" reflected therein.[59] Plaintiffs argue that the sales number reflected in the 2020 P&L ($6,334,753.36) was "materially exaggerated"[60] because the following items were improperly included as the revenue in the 2020 P&L: (i) Mr. Minnix's salary; (ii) loan proceeds; and (iii) advance payments from customers. However, the evidence failed to demonstrate that the sales number was inflated. Plaintiffs also argue the post-closing losses and the text messages between Mr. Minnix and Ms. Engle demonstrate the numbers included in the 2020 P&L were manipulated.[61]

### a. Salary as Revenue

Plaintiffs argue that Mr. Minnix "often took his salary and then re-deposited that salary back into Craftwork when things were 'tight,' . . . which inflated Craftwork's revenue."[62] However, Mr. Minnix's testimony regarding re-depositing his salary was in relation to the Business Offering, not the 2020 P&L.[63] While the Business Offering references owner's salary as part of 2019 expenses, the 2020 P&L does not. Furthermore, as discussed below, Plaintiffs admit that "[t]he revenue numbers were verified by looking at the Craftwork bank statements, or verifying them with Engle."[64] No other evidence was presented for this proposition.

### b. Loan Proceeds as Revenue

Plaintiffs also argue that Mr. Minnix "deposited MCA loan proceeds into that same Craftwork bank account as with revenue such that MCA loan proceeds were often counted as revenue as well."[65] However, there was no evidence that loan proceeds were included in the 2020

---

[59] Trial Tr. vol. 1 at 185:25-186:2.
[60] Plaintiffs' Closing Argument at 2.
[61] Plaintiffs' Closing Argument at 3-4.
[62] Plaintiffs' Closing Argument at 2 (first citing Trial Tr. vol. 1 at 43:14-18, 45:7-11, 49:22-23; and then citing Trial Tr. vol. 2 at 41:19-42:25).
[63] Trial Tr. vol. 1 at 41:8-43:18, 45:7-11, 49:22-50:20.
[64] Plaintiffs' Closing Argument at 7.
[65] Plaintiffs' Closing Argument at 3.

P&L. While Plaintiffs argue that Mr. Struck "found Craftwork loan deposits pre-closing booked as income,"[66] Mr. Struck actually testified that "I think that it's *possible* that some of the loan deposits were recorded as income."[67] Plaintiffs point to a specific $150,000 loan from IOU Central, Inc. ("IOU") that allegedly appeared to be income based on Craftwork's bank statements; however, that loan was not obtained until March 4, 2021,[68] one month after the 2020 P&L was sent to Dr. Lawless and Mr. Struck, and therefore is not relevant for purposes of the 2020 P&L. Plaintiffs further suggest that characterizing loans as income was a "practice" confirmed by a text exchange between Mr. Minnix and Ms. Engle;[69] but Mr. Minnix's response to Ms. Engle in the text exchange clarifies that the $150,000 deposit was a loan, which implies the deposit was reported as a loan, not income.[70] Furthermore, it appears when Mr. Minnix treated loan proceeds as income, he listed it separately from sales income as demonstrated by the *Jan - Dec 20 Ordinary Income/Expense Income* (the "2020 Income Statement") that was sent to Plaintiffs the day after the 2020 P&L.[71] The 2020 Income Statement[72] reflects total income of $8,098,353.36, calculated by adding the line item "Loans to Business" in the amount of $1,753,600 to the line item "Sales" in the amount of $6,344,753.36. The sales number in both the 2020 P&L and the 2020 Income Statement are identical. Based on the evidence admitted at Trial, Plaintiffs failed to prove that loan proceeds were included as income in the 2020 P&L.

---

[66] Plaintiffs' Closing Argument at 3.
[67] Trial Tr. vol. 1 at 194:1-2 (emphasis added).
[68] Pls.' Ex. 1 (Doc. No. 58-1); Pls.' Ex. 51 (Doc. No. 59-1).
[69] Plaintiffs' Closing Argument at 3 (first citing Pls.' Ex. 1 ¶ 10 (Doc. No. 58-10); and then citing Pls.' Ex. 111 at 164 (Doc. No. 60-12)).
[70] Pls.' Ex. 111 at 164-66 (Doc. No. 60-12).
[71] Pls.' Ex. 44 (Doc. No. 58-44).
[72] Plaintiffs originally argued that the 2020 Income Statement was the allegedly materially false document they had relied on and attached it to the Complaint. *See* Complaint, Ex. D (Doc. No. 1-4). However, Plaintiffs later focused their arguments at Trial on their reliance on the 2020 P&L.

### c. *Inclusion of Unearned Income as Revenue*

Plaintiffs argue that Mr. Minnix inflated the revenue numbers by booking unearned income as revenue based on "substantial completion" of jobs that were not substantially complete.[73] While there was some testimony to support these allegations, the testimony did not "paint[] a substantially untruthful picture"[74] of the sales number. While Dr. Lawless testified that about $300,000 was paid to Craftwork but unearned,[75] neither the testimony nor documents admitted into evidence tied the referenced amounts to the revenue referenced in the 2020 P&L. The alleged practice alone is not enough to prove that the 2020 P&L was materially false.

### d. *Post-Closing Losses*

Plaintiffs argue that CC&M "began losing money immediately and catastrophically, losing about $500,000 in the first six months" after closing;[76] and "[b]ased on the revenue numbers provided before the closing in [the 2020 P&L], [CC&M] should have been cash flowing $140,000 per month which, even if cash strapped after the closing, would have resolved itself in three to four months, and six months at the most."[77] At Trial, Mr. Struck testified that CC&M should have been more successful after the sale because the "P&Ls show $800,000 a year in interest being paid and . . . a relatively zero profit. So all the profits are going for interest. You add back that 800,000 in interest that's showing up on those P&Ls, you add back the seller's $290,000 salary, you're now at $1.1 million."[78] Dr. Lawless also testified that CC&M should have had income of $120,000 in excess of expenses on a monthly basis.[79] However, the 2020 P&L does not reflect Craftwork had

---

[73] Plaintiffs' Closing Argument at 3 (first citing Trial Tr. vol. 1 at 195:21-197:3; then citing Trial Tr. vol. 2 at 197:13-19; and then citing Pls.' Ex. 50 (Doc. No. 58-50)).
[74] *In re Anzo*, 547 B.R. at 466 (quoting *In re Greene*, 2013 WL 6911376, at *2).
[75] *See* Trial Tr. vol. 1 at 195:21-197:3; Trial Tr. vol. 2 at 197:13-198:3.
[76] Plaintiffs' Closing Argument at 3 (first citing Trial Tr. vol. 1 at 191:19-25; and then citing Trial Tr. vol. 2 at 203:14-204:7).
[77] Plaintiffs' Closing Argument at 3-4 (citing Trial Tr. vol. 2 at 192:7-21).
[78] Trial Tr. vol. 1 at 194:12-17.
[79] Trial Tr. vol. 2 at 199:17-22.

income in excess of expenses and therefore does not support the argument that the 2020 P&L was materially false.

The 2020 P&L shows interest expense in the amount of $813,240.32 plus other expenses totaling $1,209,482.05. However, owners' salary of $290,000 is not one of the listed expenses,[80] and the total net income reflected in the 2020 P&L is *negative* $812,565.73. Therefore, even if the interest expense of $813,240.32 was not included, the net income would only total $674.59, not $1.1 million. Furthermore, the fact that CC&M's bank statements for 2021 after the closing reflect losses[81] is not indicative that the 2020 P&L was materially false as the 2020 P&L showed, at best, a net income of $674.59 (if the interest expense was not included).

   *e. Text Messages*

Finally, Plaintiffs rely mainly on text message exchanges[82] between Mr. Minnix and Ms. Engle to show that Mr. Minnix was working with Ms. Engle to inflate the revenue numbers. It is undeniable that the text messages appear damning when read on paper. However, the Court, as trier of fact, must determine the credibility of witnesses.[83] While the text messages did imply that Mr. Minnix sought to make the financial statements look good for the bank so Plaintiffs could get

---

[80] The 2020 P&L includes "salaries-office & wages" expense in the amount of $2,595. The 2020 P&L also includes a "Per Diem" in the Cost of Goods Sold in the amount of $227,206.76, but there was no evidence to suggest that this was Mr. Minnix's salary.
[81] Plaintiffs' Closing Argument at 4 (citing Pls.' Ex. 15 (Doc. No. 58-15)).
[82] Pls.' Ex. 111 (Doc. No. 60-12).
[83] *See, e.g.*, *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994) ("The credibility of a witness is in the province of the factfinder and this court will not ordinarily review the factfinder's determination of credibility." (citing *United States v. Billue*, 994 F.2d 1562, 1563 (11th Cir. 1993))); *Crossman v. Burke (In re Burke)*, Ch. 7 Case No. 6:19-bk-04254-KSJ, Adv. No. 6:19-ap-00329-KSJ, 2021 WL 1997257, at *3 (Bankr. M.D. Fla. May 18, 2021) ("But, as the trier of fact, my job is to determine a witness's credibility." (citing *In re Screen*, No. 04-40615, 2004 WL 6044674, at *1 (Bankr. S.D. Ga. Sep. 20, 2004))); *see also PRN Real Est. & Invs., Ltd. v. Cole*, 85 F.4th 1324, 1339 (11th Cir. 2023) ("We generally defer to the trier of fact's credibility determination because the fact finder heard the witness's testimony and saw his demeanor, while we are stuck with a 'cold paper record.'" (quoting *United States v. Peters*, 403 F.3d 1263, 1270 (11th Cir. 2005))).

financing to purchase the business,[84] or look good for a potential client,[85] having observed Ms. Engle's demeanor as well as the other evidence admitted at Trial, the Court finds Ms. Engle's testimony that she did not manipulate the numbers to be credible.[86] Neither the text messages nor other evidence demonstrate that the 2020 P&L numbers were actually manipulated.

For the above stated reasons, the Court finds that Plaintiffs have not proven that the 2020 P&L was materially false.

### 2. Reasonable Reliance

Even assuming the 2020 P&L was materially false, Plaintiffs have not demonstrated reasonable reliance by a preponderance of the evidence. To find a debt non-dischargeable pursuant to § 523(a)(2)(B), Plaintiffs must demonstrate they actually and reasonably relied on the financial statement.[87]

"A financial statement does not have to be the only factor influencing a creditor; partial reliance is all that is needed."[88] As noted above, Mr. Struck testified that the 2020 P&L was "the financial statement that [he] primarily relied upon to acquire Craftwork."[89] However, the Court finds this testimony unpersuasive as other testimony and documents admitted into evidence establish Plaintiffs disregarded the 2020 P&L when deciding to close. Rather, Mr. Struck principally relied on the Business Offering,[90] Newtek's assessment of Craftwork,[91] and Dr.

---

[84] *See, e.g.*, Pls.' Ex. 111 at 4-10 (Doc. No. 60-12).
[85] Pls.' Ex. 111 at 76 (Doc. No. 60-12) ("Mindy the p&l we are asking for now is to give to a client that wants to give a 2m job and I can't show all this interest loss so I need to make this different then what we showed Jeff whos buying the company.").
[86] Trial Tr. vol. 2 at 70:6-10. While Ms. Engle admitted that clients, including Mr. Minnix, would ask her to manipulate the numbers, she would not abide by their instructions and would just respond in a way to appease her clients. Trial Tr. vol. 2 at 65:13-66:14, 67:6-17, 68:1-5, 69:15-23, 82:8-16, 93:5-24.
[87] *In re Polasky*, 2021 WL 614032, at *7 (citing *In re Anzo*, 547 B.R. at 467).
[88] *In re Anzo*, 547 B.R. at 467 (citing *First Com. Bank v. Robinson (In re Robinson)*, 192 B.R. 569, 576 (Bankr. N.D. Ala. 1996)).
[89] Trial Tr. vol. 1 at 185:9-24.
[90] *See, e.g.*, Plaintiffs' Closing Argument at 5; Trial Tr. vol. 1 at 171:25-175:5.
[91] Plaintiffs' Closing Argument at 6 (citing Trial Tr. vol. 1 at 178:3-17).

Lawless' assessment of Craftwork.[92] Plaintiffs do not directly assert that the Business Offering was materially false; however, Plaintiffs focus on the Business Offering to address why Mr. Struck was interested in acquiring Craftwork.[93] And, as discussed above, Mr. Struck's testimony regarding the profit that CC&M should have been earning post-closing appears to have been based on the Business Offering, not the 2020 P&L. Furthermore, Plaintiffs admit that in determining to move forward with closing, Mr. Struck relied on Newtek's approval of financing,[94] as well as Dr. Lawless' assessment of Craftwork.[95]

Plaintiffs' primary consideration in deciding whether to purchase Craftwork was its profitability. However, as discussed above, the 2020 P&L did not show a profitable business. In fact, removing the interest from the 2020 P&L leaves the company with a net income of almost $0. The Court therefore cannot find that Mr. Struck actually relied on the 2020 P&L in deciding to purchase Craftwork.

Even if Plaintiffs actually relied on the 2020 P&L, they also must prove reliance was reasonable. "The reasonableness of a creditor's reliance is based on an objective standard—the standard of an ordinary and average person—and courts determine reasonableness based on the totality of the circumstances."[96] "Factors for consideration include whether the parties had a relationship of trust, whether any 'red flags' arose that would have alerted an ordinarily prudent person that the statements were false, and whether a minimal investigation would have revealed the statement's falsity."[97] Instances where courts have held reliance was unreasonable include when: (1) "[t]he creditor knows the financial statement is not accurate"; (2) "[t]he financial

---

[92] Plaintiffs' Closing Argument at 7.
[93] Plaintiffs' Closing Argument at 5-6.
[94] Plaintiffs' Closing Argument at 6 (citing Trial Tr. vol. 1 at 178:3-17).
[95] Plaintiffs' Closing Argument at 7 (citing Trial Tr. vol. 2 at 199:8-22).
[96] *In re Polasky*, 2021 WL 614032, at *7.
[97] *Id.*

statement does not contain adequate information to present an accurate picture of financial condition"; (3) "[t]he creditor's own investigation suggests the financial statement was false or incomplete"; and (4) "[t]he creditor fails to verify the information."[98]

The Court finds that any reliance by Plaintiffs on the 2020 P&L was not reasonable. A creditor "cannot claim reasonable reliance on a financial statement that the [creditor] knows is inaccurate or incomplete—*particularly where the [creditor] has information in its own files that confirms the inaccuracies or shows the need for further investigation or confrontation with its customer.*"[99] Dr. Lawless, acting as the agent/employee of Mr. Struck,[100] actively participated in the preparation of financial statements prior to the closing, was involved in the preparation of the 2020 P&L (or at a minimum had access to all records), and could have investigated further.[101] Furthermore, the Court credits Ms. Engle's testimony that Dr. Lawless wanted to make the numbers "look good for the bank."[102] Because Dr. Lawless acted as an agent/employee of Mr. Struck, any knowledge he acquired within the scope of his authority is imputed to Plaintiffs.[103] The Court therefore finds Plaintiffs could not have reasonably relied on the allegedly inflated numbers when Dr. Lawless was involved in the creation of the 2020 P&L.

Plaintiffs admit that they had the opportunity to investigate the numbers in the 2020 P&L by reviewing the bank statements and asking questions to get further clarification if they could not

---

[98] *Marx v. Reeds (In re Reeds)*, 145 B.R. 703, 707 (Bankr. N.D. Okla. 1992) (citing *Landmark Leasing Inc. v. Martz (In re Martz)*, 88 B.R. 663, 674 (Bankr. E.D. Pa. 1988)).
[99] *Fifth Third Bank v. Collier (In re Collier)*, 231 B.R. 618, 624 (Bankr. N.D. Ohio 1999) (quoting *Heinold Commodities & Sec., Inc. v. Hunt (In re Hunt)*, 30 B.R. 425, 450 (M.D. Tenn. 1983)).
[100] *See* Trial Tr. vol. 1 at 177:23-178:2; Trial Tr. vol. 2 at 164:13-15.
[101] Trial Tr. vol. 2 at 121:18-24, 127:1-2, 130-25-131:3. While Dr. Lawless' testimony seemingly contradicts some of Ms. Engle's testimony as he stated he just relied on the revenue numbers produced by Mr. Minnix, he also testified he would review bank statements and make inquiries of Mr. Minnix and Ms. Engle; therefore, under the circumstances, the Court finds Ms. Engle's testimony to be more credible. *See* Trial Tr. vol. 2 at 168:21-169:14.
[102] Trial Tr. vol. 2 at 64:3-16.
[103] *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1180 (11th Cir. 2025) ("Under Florida law, knowledge an agent or employee acquires within the scope of her authority generally may be imputed to her principal or employer." (quoting *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017))).

determine "what was what."[104] Plaintiffs cannot be permitted to "put their head in the sand" and now "cry[] foul."[105] While Dr. Lawless may have believed Ms. Engle was "trustworthy" and that Mr. Minnix "seemed sophisticated and competent in business and financial matters,"[106] there was no establishment of a relationship such that reliance, without further investigation, would be reasonable. Furthermore, the 2020 Income Statement was sent to Mr. Struck one day *after* he received the 2020 P&L. As discussed *supra*, the top line item of the 2020 Income Statement included a separate line item for "Loans to Business" (that was not reflected in the 2020 P&L), and both documents had the same gross sales number reflected in the 2020 P&L—so the loans to Craftwork were not hidden from Plaintiffs,[107] or at a minimum raised a red flag to investigate further.

If Plaintiffs' primary concern was profitability, the 2020 P&L would have been a red flag as it did not show Craftwork was profitable. Mr. Struck admitted that Craftwork was "underpriced" and "it was a hint that maybe the company was in trouble or for some reason that the seller was anxious to . . . sell" or "the broker that analyzed and valued the company had made a mistake."[108] Mr. Struck attributed the MCA debt to Mr. Minnix's lifestyle, not to any issue with Craftwork,[109] and presumed a lower interest loan would enable the business to be operated at a profit.[110] Mr. Struck admitted that Mr. Minnix told him that $400,000 in capitalization was insufficient, but presumed the company would make a profit if the interest expense was eliminated.[111] Given the

---

[104] Plaintiffs' Closing Argument at 7 (citing Trial Tr. vol. 2 at 41:19-42:25).
[105] *In re Reeds*, 145 B.R. at 708.
[106] Plaintiffs' Closing Argument at 7 (first citing Trial Tr. vol. 2 at 170:4-7; and then citing Trial Tr. vol. 2 at 171:20-172:2).
[107] While the IOU loan may have been concealed, as discussed *supra*, that loan was not obtained until 2021, and therefore falls outside of the timeframe for income and expenses included in the 2020 P&L. Nor was there any evidence presented that this loan was included in the 2020 P&L.
[108] Trial. Tr. vol. 1 at 173:9-16.
[109] Plaintiffs' Closing Argument at 6 (citing Trial Tr. vol. 1 at 176:24-177:22).
[110] Trial Tr. vol. 1 at 174:13-175:1; 176:18-177:22.
[111] Trial Tr. vol. 1 at 230:10-20.

number of red flags, the Court cannot find that Plaintiffs reasonably relied on the 2020 P&L, and for the foregoing reasons, the Court finds in favor of Mr. Minnix on Count I.

**B. Non-Dischargeability Under § 523(a)(6) – Count II**

To except their claim from discharge under § 523(a)(6), Plaintiffs must prove that Mr. Minnix owes a debt based on Mr. Minnix (1) deliberately and intentionally, (2) injuring Plaintiffs or Plaintiffs' property, by (3) a willful and malicious act.[112] "Willfulness and malice are separate and distinct. 'Willfulness' implies intentional behavior; 'malice' connotes a malevolent purpose for the debtor's action."[113] A willful injury is committed when a debtor intentionally acts to cause injury or knows he is substantially certain to cause injury.[114] "Substantial certainty exists if a debtor knew and appreciated the substantial likelihood of injury to the party objecting to discharge."[115] "A malicious act is 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'"[116]

Plaintiffs allege that after Craftwork was sold to them, Mr. Minnix (while employed for CC&M) ran side jobs using CC&M's subcontractors and materials and grossly underbid projects that hurt CC&M. Plaintiffs further allege that after Mr. Minnix was no longer working for CC&M,[117] he tried to hire away CC&M employees and buy back the company. However, Plaintiffs failed to present sufficient evidence to support these allegations. The only evidence presented was:

---

[112] *See, e.g.*, *Kalmanson v. Nofziger (In re Nofziger)*, 361 B.R. 236, 242 (Bankr. M.D. Fla. 2006); *Doiron v. Cruz (In re Cruz)*, Ch. 7 Case No. 6:16-bk-07815-KSJ, Adv. No. 6:17-ap-00043-KSJ, 2020 WL 6054945, at *1 (Bankr. M.D. Fla. Oct. 13, 2020) (quoting *Conseco v. Howard (In re Howard)*, 261 B.R. 513, 520 (Bankr. M.D. Fla. 2001)).
[113] *In re Cruz*, 2020 WL 6054945, at *1 (citing *In re Howard*, 261 B.R. at 520).
[114] *Id.* (first citing *In re Howard*, 261 B.R. at 520; then citing *Major Sports Fantasy, Ltd v. Dowdell (In re Dowdell)*, 406 B.R. 106, 114 (Bankr. M.D. Fla. 2009); and then citing *Davis v. Vestal (In re Vestal)*, 256 B.R. 326, 329 (Bankr. M.D. Fla. 2000)).
[115] *In re Vestal*, 256 B.R. at 329 (citing *Smith v. Assevero (In re Assevero)*, 185 B.R. 951, 956 (Bankr. N.D. Ga. 1995)).
[116] *In re Cruz*, 2020 WL 6054945, at *1 (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).
[117] As discussed above, while Mr. Minnix testified that he resigned and was not terminated, Plaintiffs assert Mr. Minnix was terminated. *See supra* note 35. Whether Mr. Minnix resigned or was terminated is not relevant for purposes of this ruling.

18

(1) Mr. Struck's testimony based on hearsay,[118] which the Court finds to be inadequate;[119] and (2) Dr. Lawless' testimony regarding Mr. Minnix telling employees and contractors that Plaintiffs were ruining CC&M based on a string of texts he saw and what Mr. Minnix allegedly told him,[120] which the Court finds neither credible nor sufficient to show that Mr. Minnix was acting willfully or maliciously.

Plaintiffs also cite to examples where Mr. Minnix allegedly ordered materials without authorization.[121] While Mr. Struck testified that there was a "possibility" that the materials were ordered for "side jobs,"[122] there was no evidence that the materials were not for jobs that Mr. Minnix was working on for CC&M. While ordering supplies without authorization may have been a violation of the rules as an employee of CC&M, based on the evidence adduced at Trial, it cannot be said to constitute willful and/or malicious behavior on the part of Mr. Minnix.

Given the lack of evidence to prove that Mr. Minnix willfully and maliciously caused injury to Plaintiffs, the Court finds in favor of Mr. Minnix on Count II.

## CONCLUSION

While Plaintiffs may have suffered a significant financial loss after acquiring Craftwork, the issue is whether the debt owed to Plaintiffs by Mr. Minnix should be excepted from discharge under § 523(a)(2)(B) and (a)(6). For the reasons set forth above, the Court concludes that Plaintiffs

---

[118] *See* Plaintiffs' Closing Argument at 18 n.98 (citing Trial Tr. vol. 1 at 190:12-191:18, 195:6-20, 197:4-20, 230:21-25; Trial Tr. vol. 2 at 186:8-187:23). While Plaintiffs also cite Plaintiffs' Exhibit 21 (Doc. No. 58-21), the Court finds that exhibit to be irrelevant and cited in error.

[119] *See, e.g.*, *Pierce v. First Com. Leasing Corp.*, No. 03-A-217-N, 2006 WL 3050816, at *4 (Bankr. M.D. Ala. Oct. 24, 2006) ("This evidentiary showing is inadequate, because it is based solely on hearsay testimony." (citing Fed. R. Evid. 801)), *report and recommendation adopted*, No. 2:03cv217-WHA, 2007 WL 2693003 (M.D. Ala. Sep. 10, 2007).

[120] Plaintiffs' Closing Argument at 18 (citing Trial Tr. vol. 2 at 186:8-187:23); *see also* Trial Tr. vol. 2 at 184:24-187:23. Note that the testimony was admitted with respect to why Mr. Minnix's employment was terminated, not for the fact of what Mr. Minnix told employees and contractors.

[121] Plaintiffs' Closing Argument at 18 (first citing Trial Tr. vol. 1 at 202:17-205:2; then citing Pls.' Ex. 4 (Doc. No. 58-4); then citing Pls.' Ex. 5 (Doc. No. 58-5); then citing Trial Tr. vol. 1 at 207:1-10; and then citing Pls.' Ex. 8 (Doc. No. 58-8)).

[122] Trial Tr. vol. 1 at 203:18-204:8.

have not met their burden of proof on these claims. Because Plaintiffs have failed to meet their burden to prove entitlement to relief on Counts I and II, judgment as to Count III—the liquidation of non-discharge obligation—will be entered in favor of Mr. Minnix, and judgment as to Count IV—the imposition of an equitable lien against Mr. Minnix's Homestead—will be entered in favor of Mr. Minnix.[123] Similarly, the Court finds the Objection to Exemptions is due to be overruled.[124]

Accordingly, it is **ORDERED:**

1. The debt (if any) owed by Mr. Minnix to Plaintiffs is not excepted from discharge.

2. An equitable lien will not be imposed against Mr. Minnix's Homestead.

3. A separate judgment consistent with this ruling shall be entered.

4. A separate order overruling the Objection to Exemptions shall be entered.

# # #

Attorney G. Steven Fender is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of this Order.

---

[123] "Florida law is clear that an equitable lien may be imposed on one of two bases: (1) a written contract that indicates an intention to charge a particular property with a debt or obligation; or (2) a declaration by a court out of general considerations of a right or justice as applied to a particular circumstances of a case." *Wichi Mgmt. LLC v. Masters*, 193 So. 3d 961, 963 (Fla. 3d DCA 2016) (citing *Golden v. Woodward*, 15 So. 3d 664 (Fla. 1st DCA 2009)). "With respect to the second means of obtaining an equitable lien, it has been stated that 'an equitable lien is a right granted by a court of equity, *arising by reason of the conduct of the parties affected*, that would entitle one party as a matter of equity to proceed against certain property. . . . In order to warrant the imposition of an equitable lien under Florida law, the funds, payment of which is to be secured by an equitable lien, must be directly traceable to the real property in question, having unjustly enriched the debtor's interest in that property.'" *Id.* (alteration in original) (emphasis omitted) (quoting 34 Fla. Jur 2d Liens § 4). Equitable liens can be created when "the funds obtained through fraud or egregious conduct can be directly traced to the investment, purchase or improvement of homestead." *Levy v. Kozyak (In re Fin. Federated Title & Tr., Inc.)*, 347 F.3d 880, 888 (11th Cir. 2003) (citing *Havoco of Am., Ltd. v. Hill*, 790 So. 2d 1018 (Fla. 2001)). Plaintiffs have failed to establish fraud or egregious conduct and therefore an equitable lien is not appropriate.

[124] Plaintiffs object to Mr. Minnix's homestead exemption to the extent Mr. Minnix satisfied the mortgage on the Homestead with funds Mr. Minnix obtained from Plaintiffs through fraud or egregious conduct. The Court, having found Plaintiffs have failed to establish fraud or egregious conduct, concludes it is appropriate to overrule the Objection to Exemptions.